KRISTEN CLARKE, Assistant Attorney General
SAMEENA SHINA MAJEED, Chief
CARRIE PAGNUCCO, Acting Deputy Chief
ANDREA K. STEINACKER, Special Litigation Counsel
U.S. Department of Justice
Civil Rights Division
150 M St., NE
Washington, DC 20530
Telephone: (202) 305-0744
Fax: (202) 514-1116
Andrea.Steinacker@usdoj.gov
Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>  Plaintiff,<br><br>  v.<br><br>LOUIS LIBERTY & ASSOCIATES, PLC d/b/a/ THE HOUSE LAWYER, LOUIS A. LIBERTY, and BARNEY DIAMOS<br><br>  Defendants. | CASE NO.  22-CV-5639<br><br>**COMPLAINT** |

The United States of America ("United States") alleges as follows:

**NATURE OF THE ACTION**

1. This is a civil action brought by the United States to enforce provisions of the Fair Housing Act, 42 U.S.C. §§ 3601–3619 ("FHA").

2. This action is brought pursuant to 42 U.S.C. § 3612(o) on behalf of Alejandrina Rocha, Juan Rocha, Aureliano Ceja, and Lorena Ceja (collectively, the "Complainants").

COMPLAINT                                                               1

## JURISDICTION AND VENUE

3. The Court has jurisdiction over this action under 42 U.S.C § 3612(o) and 28 U.S.C. §§ 1331, 1345.

4. Venue is proper in this district under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the United States' claims occurred there.

## THE COMPLAINANTS AND PARTIES

5. Complainants Alejandrina Rocha and Juan Rocha are Hispanic and speak Spanish and English. At all times relevant to this Complaint, they owned and resided in a single-family home located at 1737 15th Street, San Pablo, California, 94806, with their children and Ms. Rocha's parents.

6. Complainants Aureliano Ceja and Lorena Ceja are Hispanic and native Spanish-speakers with limited English proficiency. At all times relevant to this Complaint, they owned and resided in a single-family home located at 1886 Broadway, Placerville, California, 95667, with their two sons.

7. Defendant Louis Liberty & Associates, PLC d/b/a The House Lawyer ("THL"), was a California corporation with its principal place of business at 370 Bridge Parkway #2, Redwood City, California, 94065. At all times relevant to this Complaint, THL marketed itself as providing services to assist clients in applying for and negotiating mortgage modifications with their lender.

8. Defendant Louis A. Liberty was at all times relevant to this Complaint a licensed attorney. In January 2011, Defendant Liberty partnered with Defendant Barney Diamos and assumed control of The Loan Negotiator Group, Inc. Defendant Liberty then changed the name of the company to The House Lawyer. At all times relevant to this Complaint, Defendant Liberty was responsible for all legal services offered by THL.

9. Defendant Barney Diamos at all times relevant to this Complaint held joint operational control of THL with Defendant Liberty. Among other roles, Barney Diamos was in charge of training and supervising THL staff, setting hours and rules for the company, and assigning work to staff. Barney Diamos also played a significant role in marketing for THL. He also owned a staffing company, Economy Administration, which provided staff to THL.

COMPLAINT                                            2

# FACTUAL ALLEGATIONS

**THL's Loan Modification Scheme**

10. Defendants, individually and through other representatives and agents, deliberately targeted Complainants and other homeowners because of their Hispanic national origin for a scheme involving unfair and deceptive home loan modifications services.

11. In at least 2011 and 2012, Defendants' business model was to target Hispanic homeowners in California and falsely promise favorable home loan modifications in exchange for thousands of dollars in fees. A loan modification changes one or more loan terms to make the home more affordable to the homeowner, such as reducing an interest rate, changing an adjustable interest rate to a fixed rate, extending the term of the loan, eliminating a pre-payment penalty, eliminating a balloon payment, or other change.

12. Defendants did not obtain the promised loan modifications for the Complainants and other clients; nor did they make good faith efforts to obtain the loan modifications, despite receiving substantial fees in payment. Defendants also interfered with homeowners' mortgages and knowingly placed their clients' homes at risk of foreclosure by instructing the Complainants and other clients to refrain from contacting their lender and to refrain from making any payments to their lenders.

13. Defendants targeted Hispanic homeowners by specifically marketing their loan modification services to Hispanic homeowners in Spanish media outlets, including on Spanish radio and television and through social media.

14. In 2011, radio advertisements for THL were aired on a daily basis on two Spanish-language radio stations.

15. In 2011, programming featuring a local pastor and THL employees aired on public access television targeting the Hispanic community. The programming promoted THL's mortgage modification services and warned against contacting organizations that provided services free of charge. At the time, following the 2008 financial crisis, numerous organizations, including housing counseling agencies certified by the U.S. Department of Housing and Urban Development ("HUD"), were available to help clients at risk of foreclosure or facing financial distress with loan modifications free of charge.

16. At the times relevant to this complaint, THL also had Facebook and Twitter accounts, and a former employee of THL stated that THL would use its social media accounts to search for Hispanic homeowners to offer THL's services.

17. The majority of THL's advertisements during the relevant time period were in Spanish. According to a former THL employee, Defendant Barney Diamos stated to employees words to the effect that the Hispanic community was "uneducated" and would be willing to pay for THL's services.

18. The large majority of THL's clients were Hispanic, and many did not speak English.

19. Once a client was determined eligible for THL's services, THL would have the client sign two contracts: (1) a Modification Package Attorney-Client Fee Agreement with Addendum ("Modification Agreement") and (2) a Negotiation Attorney-Client Fee Agreement with Addendum ("Negotiation Agreement"). The client would also be provided additional documents, including a pamphlet titled "How to Handle Your Bank During a Loan Modification," which advised clients not to "interfere" with THL's negotiation process and to "avoid and forward all lender contact" to THL.

20. The Modification Package Addendum to Contract and Disclosure required clients to initial the false statement, "Client has not been advised by law firm to stop making their mortgage payment in regard to their desire to acquire a loan modification." It also required clients to initial the statement "I fully understand that Law Firm does not guarantee the approval by client's lender of a loan modification or the terms of a loan modification that is approved by lender." Despite requiring clients to initial these statements, THL staff told clients to stop paying their mortgages to obtain a loan modification and falsely promised to obtain the modifications.

21. THL documents show that clients were charged a fee of $2,500 to prepare the loan modification application and an additional $750 to $1,000 to negotiate the loan modification. Clients were also charged a $50 monthly service fee. Defendants did not perform the services as promised in their advertising or initial intake interviews, despite charging these fees.

22. Former THL clients reported difficulty in contacting THL to get updates on the status of their modification requests, and former THL employees have acknowledged that THL's clients were not receiving adequate service.

COMPLAINT 4

23. THL sent client disengagement letters around June 2012 to notify homeowners that THL would no longer represent them and closed its office on or about June 15, 2012.

24. In 2012, at least nine THL mortgage modification clients, including HUD Complainant Alejandrina Rocha, filed complaints with the State Bar of California alleging that Defendant Liberty had not provided adequate legal services. In July 2013, in the case of former THL client Miguel Baylon, the State Bar Court found that Defendant Liberty had violated California state law by collecting an advance fee for loan modification services. Defendant Liberty stipulated to violating the same statue for the eight other complaints filed against him, including the Rocha complaint.

**Complainants Alejandrina and Juan Rocha**

25. Around August 2011, Complainant Alejandrina Rocha's father, Ignacio Otero, heard an advertisement on Spanish-language radio claiming that THL had helped hundreds of people successfully modify their mortgages. Otero told Ms. Rocha about the advertisement. Around the same time, Ms. Rocha saw a Spanish-language infomercial for THL's services on Univision 14.

26. On August 19, 2011, Ms. Rocha visited THL's office in Redwood City, California, to seek assistance obtaining a home loan modification. When Ms. Rocha called to make the appointment, THL employee Carolina Tellez told her to bring her last month's pay stub, her most recent utility bill, and her bank statements from the past three months to the appointment.

27. At the time Ms. Rocha sought THL's assistance to obtain a mortgage modification, she was current on her mortgage payments. When she met with THL employees Ms. Tellez and Jesse Gonzalez on August 19, 2011, Ms. Rocha told them that she did not want to default on her mortgage and wanted to lower the interest rate. Ms. Tellez and Mr. Gonzalez told Ms. Rocha they would "definitely" be able to help her, and it would take six to eight months to obtain the loan modification.

28. THL knew that Ms. Rocha was not eligible for a loan modification because she was current on her mortgage. During the August 19, 2011 meeting, THL employees Ms. Tellez and Mr. Gonzalez told Ms. Rocha that the only way she could secure a loan modification was if she stopped making her mortgage payments.

29. During the same August 19, 2011 meeting, Ms. Tellez and Mr. Gonzalez provided Ms.

Rocha with a Modification Agreement and other documents for her to complete and sign. THL also gave Ms. Rocha the Modification Addendum and the document titled "How To Handle The Bank During The Loan Modification Process," which advised clients not to "interfere" with THL's negotiation process and to forward all lender communications to THL.

30. On or soon after August 23, 2011, Ms. Rocha called Ms. Tellez to object to initialing certain items in the Modification Addendum. Specifically, the Modification Addendum required Ms. Rocha to sign provisions stating that THL had not told her to stop making her mortgage payments and that she understood that THL did not guarantee approval of a loan modification, which conflicted with what she had been told by Ms. Tellez and Mr. Gonzalez at the August 19 meeting. Ms. Tellez told Ms. Rocha that the terms were just "legal jargon" that THL had to include in the document. Ms. Rocha signed the documents because she felt like she did not have a choice.

31. On August 29, 2011, Ms. Rocha returned the signed Modification Agreement and Addendum to THL. Per the Modification Agreement, Ms. Rocha sent THL two payments of $1,150 by separate checks dated September 6, 2011, and October 8, 2011. THL cashed each check within a day or two of the check dates, despite the fact that the Modification Agreement stated that the fee would be payable "[o]nly at the conclusion of services."

32. In October 2011, following the advice of Ms. Tellez and Mr. Gonzalez, Ms. Rocha stopped paying her mortgage to her lender, Everhome.

33. On or around October 12, 2011, THL faxed Ms. Rocha's loan modification application to Everhome.

34. From approximately September 7, 2011, until December 2011, Ms. Rocha called THL numerous times but was never able to reach anyone about the details of her case. On or around December 12, 2011, Ms. Rocha emailed THL to inform them that she was coming in to THL's office to find out about her case.

35. On or around December 12, 2011, as Ms. Rocha was on her way to the THL office, a THL employee called her and told her that her case had been assigned to another employee whose notes were lost and that THL would have to start her case over.

COMPLAINT 6

36. After this call, a THL staff member emailed Ms. Rocha a request for documents. Ms. Rocha sent in the same paperwork she had already provided.

37. In or around January 2012, Ms. Rocha started to receive letters from Everhome stating that her home was going to be sold in foreclosure and she became worried that she would lose her home. When Ms. Rocha called to discuss the letters with THL, Ms. Tellez told Ms. Rocha not to worry about it and that being in default was required to get a loan modification.

38. On or about January 12, 2012, Ms. Rocha called Everhome and learned for the first time that her October 2011 modification application had been denied shortly after it was submitted. THL did not communicate this denial to Ms. Rocha until at least February 2012.

39. On or around February 2, 2012, a THL employee spoke with an Everhome representative, who said that Ms. Rocha's account was now five payments behind and in foreclosure.

40. On or around February 2, 2012, a THL employee called Ms. Rocha and requested that Ms. Rocha send updated financial statements in order to re-submit her loan modification package.

41. On or around March 13, 2012, Ms. Rocha signed and submitted documents for a new loan modification package to THL. On March 22, 2012, THL faxed the updated loan modification package to Everhome.  Everhome later denied this modification request.

42. On or around June 8, 2012, a THL employee informed Ms. Rocha via voice message that THL would no longer represent her.

43. In or around August 2012, Ms. Rocha worked with a free legal services provider to negotiate a payment plan with Everhome to bring her mortgage up to date and to pay the late fees that had accumulated.

44. Ms. Rocha paid THL a $50 monthly servicing fee in November and December of 2011 and in January, February, and March of 2012.

45. Defendants accepted Ms. Rocha as a client and charged her approximately $2,550.00 over a 10-month period for loan modification services. During this time, Defendants submitted her application twice and did not obtain a loan modification. Defendants instructed her at least twice not to contact her lender and not to pay her mortgage. Instead of obtaining a loan modification, Ms. Rocha was

COMPLAINT    7

diverted from obtaining legitimate assistance, owed and paid late fees to her lender, and unnecessarily risked foreclosure as a result of Defendants' predatory scheme.

**Complainants Aureliano Ceja and Lorena Ceja**

46. Mr. Ceja first learned of THL in or around June of 2011 when he heard THL employee Jesse Gonzalez on a radio advertisement on Spanish language radio. In the advertisement, Mr. Gonzalez claimed that THL had helped hundreds of people successfully modify their mortgages and could lower people's mortgage payments by $800 to $1,000 per month.

47. On June 16, 2011, Mr. Ceja visited THL's office in Redwood City, California. Mr. Ceja met with Carolina Tellez. They spoke Spanish throughout the appointment.

48. Ms. Tellez told Mr. Ceja that he would be represented by a lawyer named Louis Liberty, but at no time during Mr. Ceja's dealings with THL did he meet or communicate with Defendant Liberty.

49. At the time Mr. Ceja sought THL's assistance to obtain a mortgage modification, he was current on his mortgage payments.

50. THL knew that Mr. Ceja was not eligible for a loan modification because he was current on his mortgage. During the June 16, 2011 appointment, Ms. Tellez told Mr. Ceja that THL could obtain a loan modification for him, but he would need to stop making mortgage payments. Ms. Tellez told Mr. Ceja not to tell anyone that THL instructed him to stop making his mortgage payments and that, by stopping payments, THL would be pushing the bank to give him a modification. Ms. Tellez further told Mr. Ceja not to worry because the bank was not losing money and it was in the bank's interest to give him a modification.

51. During the June 16, 2011 appointment, Ms. Tellez also told Mr. Ceja that the loan modification process could take eight months to a year, but she guaranteed that THL's process would work because the bank needed his money. Ms. Tellez also told Mr. Ceja to stop communicating directly with his bank, and that if his bank contacted him, he should direct the bank to THL.

52. At his June 16, 2011 appointment, Mr. Ceja signed a Modification Agreement and Modification Addendum. Per the Modification Agreement, Mr. Ceja agreed to pay a fixed fee of $2,500

COMPLAINT                                              8

for attorney's services.

53. On June 28, 2011, Mr. Ceja returned to THL and signed a loan modification package prepared by THL. Mr. Ceja then signed a letter, written in English, stating that THL had completed the services covered by the Modification Agreement. Mr. Ceja also signed a Negotiation Agreement, in which THL agreed to submit Mr. Ceja's loan modification package to his bank and negotiate the modification for an additional fee of $500.

54. At his June 28, 2011 appointment, Mr. Ceja made a $1,250 cash payment to THL and provided a check for $1,250 post-dated July 28, 2011.

55. In July 2011, at the advice of Ms. Tellez, Mr. Ceja stopped paying his mortgage. On July 11, 2011, THL submitted a loan modification package to Mr. Ceja's bank.

56. On December 16, 2011, THL received a letter from Mr. Ceja's bank denying the loan modification request. THL did not inform Mr. Ceja of the denial.

57. On May 25, 2012, THL noted in its case log that Mr. Ceja was eleven months past due on his mortgage in the amount of $16,000. The case log indicated that THL mailed a disengagement letter to Mr. Ceja notifying him that THL was no longer representing him on June 14, 2012, but Mr. Ceja does not recall receiving the disengagement letter.

58. Mr. Ceja had almost no interaction with anyone at THL after the June 28, 2011 appointment. Mr. Ceja assumed that everything was in order until he started receiving notices from his bank about foreclosure. After he received the notices of foreclosure, Mr. Ceja called THL often and left messages asking about the status of his case, but no one from THL returned his calls.

59. On August 13, 2012, Mr. Ceja went to THL's office, a four-hour drive from his residence, because THL was not returning his phone calls. Upon arriving, Mr. Ceja discovered that THL was no longer providing mortgage modification services. During this visit, a receptionist for Defendant Liberty told Mr. Ceja that there was no one who could speak with him. The receptionist gave him his file after he signed a disengagement letter, written in English, stating that THL was no longer representing him.

60. After Mr. Ceja's bank denied the modification request in December 2011, THL continued

COMPLAINT 9

to charge Mr. Ceja $50 in administrative fees each month despite never resubmitting a loan modification package to Mr. Ceja's bank. In total, Mr. Ceja paid THL $2,700 for its inadequate loan modification services. THL submitted one loan modification package on Mr. Ceja's behalf in July 2011.

61. In or around August 2012, Mr. Ceja contacted Make A Home Affordable to assist him in resolving his late payments. Make A Home Affordable did not charge him a fee to assist him and helped him negotiate a mortgage repayment plan with his bank.

62. Mr. Ceja's bank allowed him to pay back the money he owed and continue to make his mortgage payments instead of proceeding with foreclosure, on the condition that he would not miss a single payment during a five-year-period. It took Mr. Ceja approximately six months to pay the amount owed, and he did not miss a single mortgage payment from 2013 to 2018.

63. During the time Mr. Ceja was a client of THL, he was diverted from obtaining legitimate assistance, owed and paid late fees to his lender, and unnecessarily risked foreclosure as a result of Defendants' predatory scheme.

**Results of Defendants' Conduct**

64. Defendants' actions, including targeting advertising to Hispanic homeowners, signing contracts and accepting payments from Complainants even though Defendants knew they were not eligible for loan modifications because they were current on their mortgages, promising success in obtaining loan modifications, directing Complainants to stop making their monthly mortgage payments, and ultimately failing to obtain the promised mortgage modifications discriminated against Complainants on the basis of national origin and interfered with Complainants' fair housing rights to maintain their homes and obtain mortgage modifications free from discrimination.

65. By directing Complainants to avoid communicating with their lenders, while simultaneously failing to provide adequate services to obtain loan modifications from the lenders, Defendants interfered with their clients' ability to understand the status of their mortgages, any mortgage modification application, the possibilities for a mortgage modification, and any foreclosure action.

66. Defendants' direction to Complainants to stop paying their mortgages and stop

communication with their lenders was contrary to industry best practices recognized by the Federal Trade Commission (FTC) and, later, the Consumer Financial Protection Bureau (CFPB). The FTC promulgated the Mortgage Assistance Relief Services Rule, 75 Fed. Reg. 75092 (Dec. 1, 2010), which was later republished by the CFPB as 12 C.F.R. Part 1015 (Dec. 16, 2011) (Regulation O). This regulation prohibits mortgage assistance relief service providers from representing expressly or by implication that a homeowner should not contact their lender or servicer and misrepresenting a homeowner's obligation to make scheduled mortgage payments. *See* 12 C.F.R. §§ 1015.3(a) and (b)(4).

## HUD ADMINISTRATIVE PROCESS

67. Pursuant to 42 U.S.C. § 3610(a), Alejandrina Rocha, Juan Rocha, Aureliano Ceja, and Lorena Ceja filed complaints of discrimination on the basis of national origin against the Defendants with HUD.

68. Pursuant to 42 U.S.C. § 3610(a) and (b), the Secretary of HUD conducted and completed an investigation of each of the complaints, attempted conciliation without success, and prepared one final investigative report regarding the complaints of discrimination.

69. Based upon the information gathered in the investigation, the Secretary, pursuant to 42 U.S.C. § 3610(g)(1), determined that reasonable cause existed to believe that Defendants engaged in illegal discriminatory housing practices against each of the Complainants.

70. Therefore, on April 20, 2021, the Secretary issued a Charge of Discrimination, pursuant to 42 U.S.C. § 3610(g)(2)(A), against Defendants on behalf of each of the Complainants.

71. On May 7, 2021, Defendant Barney Diamos elected to have the claims asserted in the Charge of Discrimination resolved in a civil action pursuant to 42 U.S.C. § 3612(a).

72. On May 10, 2021, an Administrative Law Judge issued a Notice of Election to Proceed in United States Federal District court and terminated the administrative proceeding on the Charge of Discrimination.

## COUNT I

73. Plaintiff re-alleges and herein incorporates by reference the allegations set forth above.

74. Complainants' properties are "dwellings" within the meaning of the Fair Housing Act, 42

U.S.C. § 3602(b).

75. By the actions and statements referred to in the foregoing paragraphs, Defendants have:

    a. Discriminated in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of national origin, in violation of 42 U.S.C. § 3604(b);

    b. Discriminated in the terms and conditions of residential real estate-related transactions because of national origin, in violation of 42 U.S.C. § 3605;

    c. Coerced, intimidated, threatened, or interfered with persons in the exercise or enjoyment of, or on account of their having exercised or enjoyed, their rights under the Fair Housing Act, in violation of 42 U.S.C. § 3617.

76. Complainants are "aggrieved persons" as defined in 42 U.S.C. § 3602(i) and suffered injuries as a result of Defendants' discriminatory conduct.

77. Defendants' actions described in the preceding paragraphs were intentional, willful, and taken in disregard for the rights of the Complainants.

## **PRAYER FOR RELIEF**

WHEREFORE, the United States prays that the Court enter an ORDER that:

1. Declares that Defendants' conduct as set forth above violates the Fair Housing Act;

2. Enjoins Defendants and their agents, employees, and successors, and all other persons in active concert or participation with them from:

    a. Discriminating on the basis of national origin in violation of the Fair Housing Act;

    b. Failing or refusing to take such affirmative steps as may be necessary to restore, as nearly as practicable, the victims of Defendants' unlawful practices to the position they would have been in but for the discriminatory conduct; and

    c. Failing or refusing to take such affirmative steps as may be necessary to prevent recurrence of any discriminatory conduct in the future, and to eliminate, to the extent practicable, the effects of their unlawful practices;

3. Awards monetary damages to Complainants and to all other persons harmed by the Defendants' discriminatory practices, pursuant to 42 U.S.C. § 3612(o)(3); and

The United States further prays for such additional relief as the interest of justice may require.

Dated: September 30, 2022

Respectfully submitted,

MERRICK B. GARLAND
Attorney General

KRISTEN CLARKE
Assistant Attorney General
Civil Rights Division

/s/ Andrea K. Steinacker
SAMEENA SHINA MAJEED
Chief
CARRIE PAGNUCCO
Acting Deputy Chief
ANDREA K. STEINACKER
Special Litigation Counsel
United States Department of Justice
Civil Rights Division
Housing and Civil Enforcement Section
150 M St., NE
Washington, DC 20530
Telephone: (202) 305-0744
Facsimile: (202) 514-1116
E-mail: Andrea.Steinacker@usdoj.gov